744 So.2d 1084 (1999)
P. Gary STERN, M.D., Appellant,
v.
PAUL REVERE LIFE INSURANCE COMPANY, Appellee.
No. 98-2819.
District Court of Appeal of Florida, Fourth District.
September 29, 1999.
Rehearing Denied December 2, 1999.
*1085 Gary M. Farmer, Jr. of Gillespie, Goldman & Kronengold, Fort Lauderdale, P.A., and Jonathan Wald of Goldfarb, Gold, Gonzalez & Wald, Miami, for appellant.
Mark D. Greenberg of Lopez Greenberg & Best, Miami, for appellee.
HAZOURI, J.
P. Gary Stern, M.D. (Stern) appeals from a final summary judgment entered in favor of Paul Revere Life Insurance Company (Paul Revere) on Stern's breach of contract suit on an income disability policy (policy) written by Paul Revere. We find there are genuine material issues of fact which are unresolved and, thus, reverse the granting of the summary judgment.
The policy involved in this case was issued in November of 1976. Pursuant to the terms of the policy, the insured is eligible for total disability benefits if "as a result of injury or sickness" the insured is "unable to perform the duties of his regular occupation and is not engaged in any other occupation." From the definition section of the policy, sickness is defined only as "a sickness or disease which is first manifested while your policy is in force." Paul Revere concedes that a sickness may include a physical or psychiatric condition. The phrase "unable to perform" is not defined with any specificity; however, the term "occupation" is defined as "the occupation in which you are regularly engaged at that time you become disabled. If your occupation is limited to a recognized specialty within the scope of your degree or license, we will deem your specialty to be your occupation." Stern, at the time of his alleged disability, was a medical doctor specializing in internal medicine and gastroenterology.
In Stern's complaint for breach of contract, he contends that on April 21, 1989, he became totally disabled because of a psychosexual disorder and anxiety depression syndrome. Paul Revere initially honored the claim of total disability but discontinued disability payments in March of 1991. Paul Revere contends that Stern is not totally disabled as a result of a sickness but unable to perform the duties of his occupation because he engaged in intentional acts of sexual misconduct with female patients resulting in the Department of Professional Regulation (DPR) revoking his license to practice medicine and because he was convicted of two felony charges of sexual battery and four battery misdemeanors.
Prior to coming to the state of Florida to practice medicine, Stern practiced his specialty in Connecticut. In 1980, after continuously practicing internal medicine in Connecticut since 1972, administrative *1086 charges of improprieties with his female patients were brought against Stern by the State of Connecticut Medical Examining Board. Stern was diagnosed as having an adjustment reaction disorder and a psychosexual disorder. Stern's improper conduct resulted in the relinquishment of his license to practice medicine in Connecticut. Because Stern had a license to practice medicine in the state of Florida, he moved to Florida and commenced his practice in internal medicine and gastroenterology. While practicing medicine in Florida, he continued to engage in improper sexual conduct with some of his female patients.
In April of 1989, Stern's conduct led to the involvement of the Physician's Recovery Network. Stern was referred to an inpatient mental health program in Golden Valley, Minnesota, where his treating physician diagnosed him as having a psychosexual disorder, dysthymia, adjustment disorder and narcissistic personality disorder. At the conclusion of the program on June 2, 1989, Dr. Aviel Goodman discharged Stern noting in a letter of June 6, 1989, that "from a psychiatric standpoint, there are no apparent contraindications to Dr. Stern returning to work, with whatever stipulations or restrictions the state board may find necessary." On July 11, 1989, the DPR issued an emergency order suspending Stern's license. Stern then filed a claim for disability benefits with Paul Revere alleging his illness rendered him unable to perform the duties of his regular occupation.
Stern was evaluated on behalf of the DPR by Christopher B. Mahon, M.D., who noted that Stern met the criteria for a sexual disorder as well as a narcissistic personality disorder with histrionic personality traits. Dr. Mahon opined that these disorders were long standing and it would not be appropriate for Stern to return to practice at that time. On January 19, 1990, Stern entered into a stipulation to relinquish his license to practice medicine and the DPR's board of medicine entered a final order on February 5, 1990 approving the stipulation in which Stern's license to practice medicine was surrendered for revocation. Stern was later arrested and found guilty of two felony charges of sexual battery and four battery misdemeanors. He was ultimately incarcerated for his illegal conduct.
While incarcerated, Stern's treating physician, Dr. Phillip B. Phillips, noted that in terms of medical ability, Stern would be able to practice medicine on male patients assuming that he had a license. The physician that saw Stern after he was released from prison, Dr. Alvaro Manotas, also indicated that Stern was physically and intellectually capable of performing his duties as a physician in terms of diagnosis and treatment.
In granting the motion for summary judgment, the trial court made a distinction between whether Stern was suffering from a "factual disability" or a "legal disability." The trial court concluded that Stern had the functional ability to perform the duties of his occupation but because of the revocation of his license and subsequent conviction and incarceration, it was illegal for him to practice his profession and, therefore, concluded Stern was not eligible for total disability benefits under the terms of the policy.
The conclusion made by the trial court as to what causes Stern to be unable to practice the regular duties of his occupation is a finding of fact which is in dispute. The factual conflict is summarized by the trial court at the conclusion of the summary judgment hearing when he states that "the ultimate issue is whether it is the underlying alleged psychological disorder or the intervening legal developments that allegedly result from that psychological disorder that causes Dr. Stern to be incapable of practicing his profession." This is an ultimate issue of fact that can only be resolved by the trier of fact.
The trial court correctly noted that this is a case of first impression in this *1087 state. There are no Florida cases dealing with the distinction between a factual disability and a legal disability. The trial court relied upon three out of state cases in which insurance companies were successful in denying benefits to an insured suffering from both a legal and a factual disability. See Massachusetts Life Ins. Co. v. Ouellette, 159 Vt. 187, 617 A.2d 132 (1992); Grayboyes v. General Am. Life Ins. Co., 1995 WL 156040 (E.D.Pa.1995); Goomar v. Centennial Life Ins. Co., 855 F.Supp. 319 (S.D.Cal.1994). In each of these cases the courts found it was contrary to the public policy of their states to permit an insured to recover for a disability which was a result of the insured's intentional criminal conduct.
We, however, find Ohio National Life Assurance Corp. v. Crampton, 822 F.Supp. 1230 (E.D.Va.1993), aff'd, 53 F.3d 328 (4th Cir.1995), more persuasive. In Crampton, the insured obtained a disability policy that did not contain an exclusion for a disability caused by an intentional act, a violation of the law or incarceration. In July of 1992, the insured was arrested and charged with numerous sexual offenses. He was released on bond and filed a claim for disability benefits in November of 1992 based upon anxiety and depression. After pleading guilty to numerous offenses in January of 1993, he was incarcerated. The insurer attempted to deny him benefits and argued his incarceration prohibited him from working. The court found that the incarceration could not act as an absolute bar to the receipt of disability insurance benefits and that "[i]f the disability is medically bona fide and genuinely arose prior to Duke's [the insured's] incarceration, the fact that Duke was eventually imprisoned does not cut off his benefits." Id. at 1232-33.
On the issue of "public policy" the Crampton court stated:
Ohio National cannot salvage its decision to stop excluding Duke's type of disability from coverage by invoking "public policy". This is especially true because there is no evidence whatsoever that Duke obtained the policy in contemplation of committing a crime or otherwise in a fraudulent manner. Public policy does not mandate that the court rewrite a contract for an insurance company which winds up later regretting its decision to remove certain exclusions from its policy.
Id. at 1233.
Although there is no evidence that Paul Revere's policy once had an exclusion for a disability caused by an insured's criminal acts, there also is no evidence that Stern obtained the policy in contemplation of committing a crime.
Under Florida law an insurer, as writer of an insurance policy, is bound by the language of the policy which must be construed liberally in favor of the insured and strictly against the insurer. See Berkshire Life Ins. Co. v. Adelberg, 698 So.2d 828, 830 (Fla.1997). The courts may not rewrite contracts, add meaning that is not present or otherwise reach results contrary to the intentions of the parties. See State Farm Fire & Cas. Ins. Co. v. Deni Assocs. of Fla., Inc., 678 So.2d 397, 401 (Fla. 4th DCA 1996). Paul Revere could have written its policy to exclude this type of alleged disability. We find no compelling reason to prohibit it as contrary to public policy and we cannot place a judicially imposed value judgment on what type of psychiatric sickness is worthy of consideration as a disability over another type.
We reverse and remand for further proceedings consistent with this opinion.
DELL and GUNTHER, JJ., concur.